Undril U. RUSSELL, Respondent,

v.

KANSAS CITY PUBLIC SERVICE COMPANY, Appellant.

No. 22202.

Kansas City Court of Appeals.

Missouri.

March 7, 1955.

Charles L. Carr, Clifford B. Smith, Hogsett, Houts & James, Kansas City, for appellant.

John M. Langsdale, Leo T. Schwartz, Kansas City, for respondent.

DEW, Judge.

Respondent was an employee of the appellant and made claim for disability arising out of alleged injuries sustained while in the course of his employment. After several hearings before the Division of Workmen's Compensation of the Department of Labor Relations of Missouri, he was finally awarded recovery for 50 percent permanent, partial disability to the body as a whole, in the sum of $25 a week for 200 weeks, plus medical expenses in the amount of $615.85. On review of this award in the circuit court, the same was affirmed, with interest. From that judgment the employer has appealed to this court.

Respondent was an employee of the appellant in 1944, and in an accident that year he received some injury to his neck, while driving a bus for appellant. This fact, however, was not originally stated in the respondent's present claim, but was brought into it by amendment and by way of additional evidence respecting it, to cover aggravation of existing conditions. The accident primarily complained of is alleged to have occurred on December 25, 1948, in which respondent was injured while driving a cinder truck for the appellant.

Respondent's testimony was that in the accident of 1944, he had stopped his bus in traffic and was violently run into from the rear by another bus, and his head was caused to snap back with such force as to throw his cap to the first or second cross seat of the bus. For some time thereafter he suffered intermittent periods of stiffness of the neck. He lost no time from his work. In the accident in 1948, on which the claim was originally filed, respondent, while driving a cinder truck for appellant, was injured when an automobile struck the right door of his truck and threw him violently to the opposite side of the seat and against a passenger seated there, after which the injuries developed as described. During the following night he was unable to stand, could not maintain his balance, was unable to cross his legs or to dress without help. He returned to his work that night and drove his bus, but experienced a staggering sensation. Because of lack of control of his fingers, he could not hold a pencil in his hand. He developed an ataxic gait, and was unable to co-ordinate the use of his legs and could not handle any small object with his hands. He was confined in a hospital for 15 or 16 days following the last

accident, during which time the doctors performed on him the operation of a cervical laminectomy.

Respondent returned to his work in August, 1949, as special operator in which work the duties were light. As such he rode in armored trucks to various division points to collect money belonging to the appellant. In 1951, respondent was again employed as a bus driver for appellant, at which he was engaged at the time of the hearing before the Industrial Commission. Such other facts and evidence as are essential will be stated hereinafter.

The appellant from the first has contended that the respondent met with no accidental injuries, but that the condition of which he complained resulted from amyotrophic lateral sclerosis, a progressive nervous disease affecting the nervous system. The testimony of appellant's medical experts tended to support such diagnosis.

Respondent's physician in his testimony compared the effects of sclerosis in the spine and the effects of an injury to the spine from trauma. He said, respecting an injured spine: " * * * it does not regenerate the same as nerves out in the periphery, away from the spinal cord. That is following injury. Now then, in a disease of lateral sclerosis, my impression is that it is progressive and continues gradually, getting worse and worse as time goes on until it finally causes the death of the individual. That is not true of injury to the spinal cord causing pressure on the spinal cord when the pressure has been relieved and released".

Only two points are made on appeal. To support the contention that the circuit court erred in affirming the award, it is asserted that (1) there was no substantial evidence in the record that the disability was permanent, and (2) there was no substantial evidence that the employee sustained 50 percent disability of the body as a whole.

There were four hearings and the medical evidence was voluminous. At the first hearing, Dr. Feierabend testified for the respondent that his condition was progressive; that he would not improve; that he never would be able to return to the work in which he was engaged at the time of the accident, and that: "I think he is permanently, totally disabled"; that "at least he could not go out into the labor market because nobody would hire him because he can't keep up his end of the work". Another physician testifying in behalf of respondent, said that after the operation on respondent's spine, he believed that, in view of the smallness or atrophy of the spinal cord it was doubtful if the respondent "will ever regain complete return of the function which he has lost and alteration of pathological changes which are present, namely, the ataxia and spasticity". At the last hearing Dr. Feierabend (1953) said he re-examined the respondent. He testified in part as follows:

"In 1950 I think this man was temporarily totally disabled, and I have testified now two or three times that I didn't think that he could return as a bus operator. Today it proves how wrong I was. He is a bus operator. There is no question about that.

"Q. Well, we are not questioning that. A. That is perfectly true. Now, the man is a lot better than I thought he would be.

"Q. What about a year from now, then? In your present view of him, do you think there will be further improvement? A. Well, Mr. Derge, I think the overwhelming preponderance of the testimony proves that any estimate for the future was grossly wrong. I don't think it would be worth a solitary hoot so far as we go from here on. In order to answer that question, I must see the man at a later date.

"Q. In other words, you cannot express an opinion at this time as to the permanency of his present condition; is that what you mean? A. I am asked to give an opinion?

"Q. Yes, sir, I— A. (Interrupting) I gave an opinion before; I was wrong. I may be wrong now. I don't know.

Human beings are not infallible, and certainly I do not make any pretense of being infallible. Heaven knows I make plenty of mistakes, and so does everyone else; but it is my opinion as of today that this man has 50 percent disability, and I think it is permanent. Now, if you ask me two years from now, I may say that is all wrong. I don't know".

Respondent's witness Dr. Coburn testified that he found that respondent had an adhesive arachnoiditis and some atrophy of the spinal cord. The physician testified that he believed the trauma of the first accident had severely damaged the bony structure of the neck, resulting in the osteoarthritic changes, and narrowing of the intervertebral disc spaces, which condition was aggravated by the accident of December 25, 1948. He said the operation took some of the pressure from the spinal cord.

Respondent himself again testified at the final hearing in 1953, and at the request of the members of the Commission demonstrated the use of his hands and fingers. He further testified that he was unable to get his fingers together; that he often stubbed the toes of his right foot while walking, and that when he was walking downhill, he had a tendency to "tighten up in the hips". "My nerves tighten up for some reason or other, I don't know why". That while he had a quivering in one hand before the accident December 25, 1948, he has since had a wasting away of muscles between his thumb and fingers on each hand; that on one occasion he was unable to lift a battery from his bus, which he formerly was able to do with one hand.

 Considering the testimony in the light most favorable to the respondent and to the finding of the Commission, as we are required to do, it is evident that there was substantial and competent evidence to support the Commission's finding that the partial disability claimed was permanent. Permanency must be shown with reasonable certainty. Garrison v. U. S. Cartridge Co., Mo.App., 197 S.W.2d 675. To establish this element of a claim the employee has the burden of proof. Smith v. National Lead Co., Mo.App., 228 S.W.2d 407. Without reviewing the evidence, we believe the respondent met those requirements of proof.

As to the percentage of respondent's partial disability, Dr. Feierabend testified that he arrived at his estimate of 50 percent disability to the body as a whole by adding 175 and 160 weeks specifically allowed by statutes for the loss of a major and a minor hand, a total of 335 weeks, and of that he considered the partial, permanent loss to such hands at 45 percent, making 160.75 weeks, to which he added 60 weeks or 15 percent of 400 weeks, which he estimated, for loss to the body, other than to the upper extremities, making a total of 210 weeks, which he had considered and estimated as "50 percent on the body as a whole", or 220 weeks, which he roughly called 50 percent. Appellant contends that by such computation the witness "tacked on" disability of the hands to the other disability, which is unauthorized by the statutes, and constitutes no competent evidence of a fifty percent permanent partial disability.

Section 287.190 RSMo 1949, V.A.M.S., pertaining to permanent, partial disability under the Workmen's Compensation Law, enumerates the number of weeks that shall be allowed for each separate injury specifically set forth. Subsection 2 of that statute provides for permanent injuries other than those specified in the statute. It reads in part: "For permanent injuries other than those above specified, the said compensation shall be paid for such periods as are proportionate to the relation which the other injury bears to the injuries above specified, but no such period shall exceed four hundred weeks. * * *" It is further provided therein that such other injuries shall include those causing loss of earning power and that for the permanent, partial loss of the use of an arm, hand, thumb, finger, etc. compensation shall be paid for the proportionate loss of the use of such hand, thumb, fingers, etc.

 At the outset it must be stated that this court has held that the fact that an employee drove a truck after sustaining

an injury to his back during the course of his employment, would not defeat his claim for permanent, partial disability to his body as a whole which was clearly established by other evidence. Worley v. Swift & Co., Mo.App., 231 S.W.2d 828, 832. The method of computation of the periods to be allowed for compensation for multiple injuries received in the same accident by an employee in the course of his employment, other than any specific injury enumerated in Section 287.190, resulting in a permanent, partial injury to the body as a whole, is explained and applied in Robinson v. Beatrice Foods Co., Mo.App., 260 S.W.2d 346, 348. It was there held that Subdivision 2 of Section 287.190 was intended as a "catch-all" for injuries not specifically enumerated in Subsection 1, and that where the particular injury claimed has no direct physical connection with any enumerated injury, the compensable period should be fixed in its relation to its maximum of 400 weeks "considered from the standpoint of the percentage of disability in the normal functions of the injured man himself." The court further said that even though " * * * an injury to the back may have no direct physical connection with the complete or partial loss of an arm or a leg or some other stated member of the body, yet it does have a relation to such a loss in the sense of the comparable degree of disability which the respective injuries may produce." The court said that when the Commission, in its discretion, fixes the disability from an unscheduled injury, at a percentage of the normal functions of the body as a whole, and awards compensation for such percentage of 400 weeks, "it is thereby measuring the disability in terms of the relation which the particular injury bears to the injuries specified in subdivision one." Likewise, such method of computation is approved in Chapman v. Raftery, Mo.App., 174 S.W.2d 352.

In the instant case it is evident that Dr. Feierabend considered the disability in the respondent's hands as having no physical connection with the "other disability", which latter, he said, "is perfectly obvious. All you got to do is watch the man walking and the rest of his body isn't normal". He said he gave an estimate of 15 percent on the body as a whole " * * * as a result of the things that he has which do not include the upper extremities. Now, then, in adding those two together, I come out at 50 percent on the body as a whole". There was evidence of such other ailments as ataxic gait, lack of balance, weakness in the dorsiflexion of the right foot, and tendency to "tighten up at the hips, when walking down hill".

The section in question was construed in Dauster v. Star Mfg. Co., Mo.App., 145 S.W.2d 499, 502. In that case there was permanent, partial loss of the use of both legs of the claimant, sustained in one accident. Recovery was allowed under the provisions of the above statute for injuries unscheduled. The court held that the statute did not contemplate two periods of compensation in such cases, but only one period not exceeding 400 weeks, to be "fixed in such proportion to the relation which the other injury bears to the injuries specified in the schedule; not in proportion to the arbitrary periods of payment provided in the schedule for a single injury, but in proportion to the relation which one injury bears to another injury when both injuries are the result of the same accident." Further authority was quoted by the court as follows: " 'However, an injury is not specific within the meaning of a schedule unless such injury relates solely to the injured member, and, if because of an injury to a specific member the whole body suffers, thereby incapacitating the workman, the injury is not specific, and if an employee suffers a specific injury and at the same time sustains other injuries, or if such specific injury has involved other portions of the body to such an extent as to cause an injury additional to the specific injury, claimant is not confined to the compensation provided for the injury to the specific member.' 71 Corpus Juris, page 838, Section 551."

The sum and substance of the medical testimony on the respondent's behalf in the instant case is that an estimate of 160

weeks was made for the permanent, partial loss of the use of both hands, and 60 weeks for other injuries not scheduled, amounting to over 200 weeks; that since only one allowance can be made for all injuries received in the one accident, a total estimate from the above computation was made that respondent had suffered a disability of 50 percent of the normal functions of the body as a whole, which method of computation in such cases has been approved. Robinson v. Beatrice Food Co., supra; Chapman v. Raftery, supra. We believe the testimony of Dr. Feierabend, together with other testimony favorable to the respondent, was substantial and competent evidence of a 50 percent permanent, partial disability to the body as a whole.

It follows that the circuit court, on review, was correct in affirming the award of the Industrial Commission. Accordingly, the judgment of the circuit court is affirmed.

All concur.