

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| WALTER ADAMS, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | WD84818 |
| | ) | |
| TREASURER OF THE STATE | ) | Opinion filed: October 25, 2022 |
| OF MISSOURI – CUSTODIAN | ) | |
| OF THE SECOND INJURY | ) | |
| FUND, | ) | |
| | ) | |
| Respondent. | ) | |

**Appeal from the Labor and Industrial Relations Commission**

Special Division: W. Douglas Thomson, Presiding Judge,
Gary D. Witt, Judge and Zel Fischer, Special Judge

Walter Adams ("Adams") appeals the Labor and Industrial Relations Commission's (the "Commission") final award ("Final Award") denying compensation from the Second Injury Fund (the "Fund"). On appeal, Adams claims the Commission erred in failing to find the Fund liable for Adams' combined disabilities from his work-related 2001 injury (the "2001 Injury") because together they met the 50-week threshold required by section 287.220.3.[1] We affirm.

---

[1]All statutory references are to RSMo (2000) as updated by supplement to September 17, 2015, the date of the primary injury.

## Factual and Procedural History

The material facts are undisputed. Adams, a 62-year-old man, has worked primarily as a diesel mechanic and has performed auto body work. Adams completed high school, two years of vocational training in cooling/refrigeration, and two years of service in the United States Army where he was trained as a big vehicle diesel mechanic. Adams suffered three significant work-related injuries during his career.

In 1984, while working on an exhaust, Adams tore ligaments, tendons and nerves in his left hand which resulted in extensive reconstructive surgery (the "1984 Injury"). As a result, Adams has limited mobility in his left hand. Adams settled his claim for this injury for 32.5 percent of his left hand at the 175-week level of the wrist, which is 56.875 weeks of disability.

In 2001, Adams fell from scaffolding while working on a trailer roof resulting in disabilities to his back and both of his knees. Adams had surgery on both knees and chiropractic massage on his back. Adams' doctor determined Adams to have 35% permanent partial disability of the right leg, 35% permanent partial disability of the left leg, and 7.5% permanent partial disability of the body as a whole due to his back, a lumbar condition. Employer's doctor determined Adams to have 5% permanent partial disability of the right leg, 3% permanent partial disability of the left leg, and 2% permanent partial disability of the body as a whole due to his lumbar condition, or 5% body as a whole for all three disabilities.

Adams settled his permanent partial disability ("PPD") claim on the 2001 Injury against employer pursuant to a stipulation for compromise settlement (the

"Compromise Settlement") signed by Adams' attorney and the Fund's attorney. The Compromise Settlement dated May 27, 2004 provides, "there are disputes between the parties to medical causal connection [and] nature and extent of [PPD] . . . . That because of the disputes . . . the parties [agree] to enter into a compromise lump sum settlement . . . . This settlement is based upon approximate disability of 15% of the body as a whole referable to bilateral knees and the low back (400-week level)," which is 60 weeks of disability. The Compromise Settlement does not provide a breakdown of weeks of disability attributed to the low back or each knee, and neither are these disabilities separately rated as both experts had done.

On September 17, 2015, Adams sustained his final work-related injury (the "Primary Injury") when he was working on semi-trailer brakes for Jim Hawk Truck Trailers ("Employer"). Adams' right hand was crushed and his right shoulder injured when his right hand was pinned between a jack handle and the bottom of the trailer. Surgery was performed on Adams' right shoulder and bicep. Thereafter, Adams filed a workers' compensation claim against Employer for PPD and a claim against the Fund for permanent total disability ("PTD").

A hearing was held on June 2, 2020. On September 29, 2020, the Administrative Law Judge ("ALJ") issued its final award ("ALJ's Award") concluding Adams is permanently and totally disabled due to the Primary Injury together with his prior disabilities from the 1984 Injury and the 2001 Injury. [2]

---

[2] Adams' workers' compensation claim against his employer was settled between the parties.

The Fund appealed the ALJ's Award to the Commission asserting the ALJ erred because the ALJ included the disabilities which resulted from the 2001 Injury in his determination but those disabilities do not qualify under section 287.220(3)(a). The Fund claimed the 2001 Injury resulted in disabilities to two specific body parts, the knees and the back, which are separate disabilities that do not separately meet the 50-week threshold. Additionally, the Fund claimed the ALJ erroneously relied on *Treasurer v. Parker*, No. WD83030, 2020 WL 3966851 (Mo. App. W.D. July 14, 2020), to circumvent section 287.220(3)(a), which was later vacated by the Supreme Court in *Treasurer of State v. Parker*, 622 S.W.3d 178 (Mo. banc 2021).

The Commission reversed the ALJ's Award finding the Fund had no liability. Adams appeals.

**Standard of Review**

"Article V, section 18 of the Missouri constitution 'provides for judicial review of the [C]ommission's award to determine whether the award is "supported by competent and substantial evidence upon the whole record.""" *Jackson Cty. v. Earnest*, 540 S.W.3d 464, 469 (Mo. App. W.D. 2018) (alternation in original) (quoting *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo. banc 2003)).

Section 287.495.1 provides:

[W]e "shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award" on the following grounds:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

4

(3) That the facts found by the commission do not support the award; [or]

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

*Earnest*, 540 S.W.3d at 469 (quoting section 287.495.1). "Although we are not required 'to view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award[,]' '[w]e will not substitute our judgment on issues of fact where the Commission was within its powers, even if we would arrive at a different initial conclusion.'" *Id.* (alternations in original) (citations omitted). "'The Commission, as the finder of fact, is free to believe or disbelieve any evidence. We defer to the Commission's findings as to weight and credibility of testimony and ***are bound by its factual determinations*.'" *Id.* (emphasis added) (quoting *Molder v. Mo. State Treasurer*, 342 S.W.3d 406, 409 (Mo. App. W.D. 2011)).

We review questions of law *de novo*. Section 287.495.1; *Cosby v. Treasurer of State*, 579 S.W.3d 202, 206 (Mo. banc 2019). Questions of statutory interpretation are questions of law and are reviewed *de novo*. *Phelps v. Mo. State Treasurer,* 629 S.W.3d 47, 50 (Mo. App. S.D. 2021) (citing *Cosby*, 579 S.W.3d at 205-06).

## Analysis

Central to this appeal, is the question of whether the disabilities to Adams' back and bilateral knees which resulted from the 2001 Injury are statutorily required to be considered in combination as a body as a whole in order to satisfy the fifty-week PPD minimum of section 287.220.3(2)(a)a, such to be considered a qualifying preexisting disability. Accordingly, we address this overarching question first.

5

"'Section 287.220 establishes the Second Injury Fund.'" *Schebaum v. Treasurer of State*, 645 S.W.3d 622, 627 (Mo. App. W.D. 2022) (citation omitted). "'The General Assembly created the Second Injury Fund in an effort "to encourage the employment of individuals who are already disabled from a preexisting injury, regardless of the type or cause of that injury.'" *Id.* (citation omitted). "The Fund 'ensures that "an employer is only liable for the disability caused by the work injury[;]'" however, the 'Fund's liability for permanent partial and total disability claims is statutorily limited [ ] to the parameters described in section 287.220.'" *Id.* (alterations in original) (citation omitted).

> In 2013, the legislature amended section 287.220 to limit the number of workers eligible for fund benefits because the Fund was insolvent. The legislature created subsection 2 of section 287.220 for compensable work injuries occurring before January 1, 2014, and subsection 3 for compensable work injuries occurring after January 1, 2014. Although the legislature retained the pre-amendment framework for fund benefits in subsection 2, it eliminated claims for permanent partial disability ("PPD") under subsection 3. Further, the legislature limited the Fund's liability for PTD claims under subsection 3.

*Parker*, 622 S.W.3d at 181 (internal citations omitted). Specific to these post-January 1, 2014 legislative limitations upon PTD claims, pursuant to section 287.220.3(2) employees must now meet two conditions to make a compensable PTD claim, to-wit:

> 3. (2) . . . Claims for permanent total disability under section 287.200 against the second injury fund shall be compensable only when the following conditions are met:
>
> (a) a. An employee has a medically documented preexisting disability equaling a minimum of fifty weeks of permanent partial disability compensation according to the medical standards that are used in determining such compensation which is:
>
>> (i) A direct result of active military duty in any branch of the United States Armed Forces; or

6

(ii) A direct result of a compensable injury as defined in section 287.020; or

(iii) Not a compensable injury, but such preexisting disability directly and significantly aggravates or accelerates the subsequent work-related injury and shall not include unrelated preexisting injuries or conditions that do not aggravate or accelerate the subsequent work-related injury; or

(iv) A preexisting permanent partial disability of an extremity, loss of eyesight in one eye, or loss of hearing in one ear, when there is a subsequent compensable work-related injury as set forth in subparagraph b of the opposite extremity, loss of eyesight in the other eye, or loss of hearing in the other ear; and

b. Such employee thereafter sustains a subsequent compensable work-related injury that, when combined with the preexisting disability, as set forth in items (i), (ii), (iii), or (iv) of subparagraph a. of this paragraph, results in a permanent total disability as defined under this chapter[.]

Section 287.800.1 requires we construe the provisions of Chapter 287 strictly.[3] "Strict construction does not authorize . . . this court to add words to or subtract words from a statute or ignore the plain meaning of the words chosen by the legislature." *Naeter v. Treasurer of Missouri*, 576 S.W.3d 233, 237 (Mo. App. E.D. 2019) (citation omitted). Moreover, consistent with precedent that employees in workers' compensation cases have both the burdens of persuasion and production,[4] the decision in *Parker* highlights the burden is on the employee to demonstrate that his preexisting disabilities qualify under section 287.220.3. Thus, to meet the

---

[3] A 2005 amendment to section 287.800 established this change to strict construction. *Kolar v. First Student, Inc.*, 470 S.W.3d 770, 777 (Mo. App. E.D. 2015) ("In 2005, Section 287.800 was amended. Previous to the amendment, it provided: 'All of the provisions of this chapter shall be liberally construed with a view to the public welfare . . . .' The current version, however, provides: '[a]dministrative law judges, associate administrative law judges, legal advisors, the labor and industrial relations commissions, the division of workers' compensation, and any reviewing courts shall construe the provisions of this chapter strictly.'" (alteration in original) (quoting section 287.800 Cum. Supp. 2008)).

[4] *See Annayeva v. SAB of TSD of St. Louis*, 597 S.W.3d 196, 200 n.8 (Mo. banc 2020).

requirements of section 287.220.3, first, the employee must have at least one qualifying preexisting disability that is medically documented, equal to at least 50 weeks of PPD, and meet one of the criteria set out in subsection 3(2)(a)a(i)-(iv). Second, the employee must show he sustained a compensable work-related injury (the "primary injury") that when combined with the qualifying preexisting disability results in PTD. Section 287.220.3(2)(a)b. While the primary injury can combine with multiple preexisting disabilities to satisfy section 287.220.3(2)(a)b, *each* preexisting disability must qualify under section 287.220.3(2)(a)a to be considered. *Parker*, 622 S.W.3d at 182; *Klecka v. Treasurer of Mo.*, 644 S.W.3d 562, 566 (Mo. banc 2022). Both conditions must be met by the employee as demonstrated by the holding in *Parker*, where the Supreme Court expressly rejected the employee's assertion that 287.220.3(2)(a)b can be met by showing the primary injury resulted in PTD when combined with all of the employee's disabilities regardless of whether those disabilities met the first condition. 622 S.W.3d at 182. The Supreme Court stated,

> [Section 287.220.3(2)(a)b][5] specifies that the subsequent work-related injury must combine "with the preexisting disability, as set forth in items (i), (ii), (iii), or (iv) of subparagraph a. of this paragraph." . . . By specifying that the preexisting disability must qualify under one of the four eligibility criteria in the first condition, *the legislature excluded* disabilities that are not the primary injury and that do not qualify under the first condition from being considered when determining if the claimant meets the second condition. Therefore, an employee satisfies the second condition by showing the primary injury results in PTD when

---

[5] In the actual language of this *Parker* quote, the Supreme Court cites section 287.220.3(2)*(b)* at this juncture. However, section 287.220.3(2)*(b)* references employees who are employed in a sheltered workshop, which is plainly not an issue in the *Parker* case. Rather, it is apparent the Supreme Court intended to reference section 287.220.3(2)*(a)b* at this juncture, as this is where the above-quoted language is found. In discussing *Parker*, we will cite to the sections to which the *Parker* court clearly meant to refer.

combined with **all** preexisting disabilities **that qualify** under one of the four eligibility criteria listed in the first condition.

. . . .

The existence of non-qualifying disabilities does not count against (or for) the claimant in evaluating whether he meets the second threshold condition.

*Id.* (first emphasis added) (other emphasis omitted). Notably, the *Parker* Court expressly addressed the legislative change to limit the Fund's liability by excluding non-qualifying preexisting disabilities from consideration in determining PTD.

Recently, in *Klecka,* 644 S.W.3d at 566, the Supreme Court reiterated the *Parker* Court's analysis in finding Klecka failed to establish he is entitled to PTD benefits from the Fund.[6] There, the Supreme Court noted that Klecka's experts' opinions that he is PTD were insufficient to show he was entitled to Fund benefits because their testimony considered *non-qualifying* preexisting disabilities in their PTD analysis. *Id.* at 567. The Supreme Court cited its previous holding in *Parker* in finding that non-qualifying preexisting disabilities cannot be considered in determining whether a claimant satisfies the second condition of section 287.220.3. *Id.* (citing *Parker*, 622 S.W.3d at 182). The Court concluded there was no evidence indicating he would still be rendered PTD absent his non-qualifying injuries. *Id.*

The import of the *Parker* and *Klecka* decisions is that there is a legislative-directed departure from earlier precedent which had allowed consideration of all

---

[6] This Court followed the Supreme Court's recent *Klecka* analysis in *Schebaum*, 645 S.W.3d at 627-31, where we held hearing loss which was rated at more than fifty weeks of PTD was not a qualifying preexisting disability in that it did not meet one of the criteria set out in subsection 3(2)(a)a(i)- (iv).

9

preexisting disabilities in the determination of PTD. It is also evident that the 2013 amendment narrows the scope of what preexisting disabilities may be properly considered when determining PTD. While the Fund was established to encourage employers to hire workers with preexisting disabilities, the Legislature amended it when the Fund was insolvent to limit those workers eligible for benefits. *See Cosby*, 579 S.W.3d at 209-10. This legislative change limiting Fund eligibility necessarily results in situations where a person can be PTD but the Fund is not statutorily liable. In sum, the legislature statutorily required strict construction of the conditions required to make a compensable PTD claim against the Fund with the expressed intent to limit Fund liability, all while continuing to place the burden of production and persuasion on the employee. We review the Commission's determination denying Fund liability in this matter through this lens.

Here, in order to make his compensable PTD claim against the Fund, Adams relied on the Compromise Settlement, which provided, "This settlement is based upon approximate disability of 15% of the body as a whole referable to bilateral knees and the low back (400-week level)." This amounts to 60 weeks of disability for the combined disabilities resulting from the 2001 Injury, without any breakdown of the disability attributable to the bilateral knees or the low back.

In reliance on *Parker*, the Commission found the Fund had no liability. The Commission stated:

> Employee had a June 14, 2001, work-related injury involving bilateral knees and his low back. Employee entered into a stipulation for compromise settlement with employer/insurer related to this injury. The parties' based their voluntary settlement on approximate disability

10

of 15% PPD to the body as a whole at the 400-week level (60 weeks) referable to bilateral knees **and** the low back. Employee's settlement stipulation failed to separately estimate disability involving different body parts as outlined in the schedule of losses established in § 287.190. We find, **as a factual matter**, that preexisting disability relating to employee's [2001] work injury did not result in PPD of at least fifty weeks to **either** employee's back or bilateral knees.[7]

(Emphasis added). The Commission concluded:

We find that *Parker* explicitly requires an employee to demonstrate PTD under § 287.220.3 **solely** by a combination of disability related to the employee's primary injury and preexisting disabilities **that qualify** under that statute. In so finding, the Court expressly rejected the notion that additional, **non-qualifying** preexisting disabilities may be considered in assessing [Fund] liability under § 287.220.3.

As we have found, in this case employee's back and bilateral knee disabilities resultant from his June 14, 2001, work injury fail to qualify as preexisting disabilities as defined by § 287.220.3(2) because neither condition resulted in at least fifty total weeks of PPD. No expert suggests that employee would be PTD in the absence of disability attributable to his 2001 work injury.[8] Because non-qualifying preexisting disabilities contributed to employee's PTD, *Parker* compels us to conclude that the [Fund] has no liability in this case.

Thus, the Commission found Adams' reliance on the Compromise Settlement insufficient to meet his burden of production in that he failed to demonstrate that either disability resulting from the 2001 Injury was a preexisting disability equaling a minimum of 50 weeks of PPD to qualify under section 287.220.3. Likewise, the Commission found Adams' reliance on the Compromise Settlement was insufficient to meet his burden of persuasion that the disabilities must be assessed together as a body as a whole disability.9 The Commission rejected the notion that the disabilities

---

7 While not expressly stated, the implication of this factual finding is that the Commission found two separate injuries.

8 Notably, the parties do not dispute this finding and no party claims that PTD resulted from the combination of the 1984 Injury and the Primary Injury without consideration of the 2001 Injury.

9 As to Adams' reliance on the Compromise Settlement to persuade the Commission the disabilities must be assessed as a body as a whole disability, we note the Commission was also correctly

11

from the 2001 Injury should be assessed together, despite the fact that they were lumped together for settlement purposes in the Compromise Settlement. And, the Commission made the factual findings that, here, there were two disabilities which were clearly differentiable, to the back and to the bilateral knees;[10] and that neither disability met the 50-week threshold by themselves.

Accordingly, the Commission found that *each* of the two disabilities resulting from the 2001 Injury failed to qualify as a preexisting disability as defined by section 287.220.3(2). As a result, neither could be considered to support a claim against the Fund for PTD. The Commission found this fatal to Adams' claim against the Fund because no expert testified Adams would be PTD in the absence of *both* disabilities attributable to the 2001 Injury when considered together. Therefore, the Commission

---

provided the medical reports prepared by Adams' doctor and employer's doctor. *Both* of these medical reports provided Permanent Disability Evaluations which addressed each of the knees and the back *as separate disabilities*. The dissent asserts these opinions are "now irrelevant" and then opines what the Commission "could" or "might" have found had the 2001 Injury not been settled. But such evidence is compelling in this case, where clearly differentiable disabilities are lumped together as a body as a whole disability for settlement purposes in the Compromise Settlement.

[10] It is evident how the Commission found two, differentiable disabilities as both the Fund and Adams plainly acknowledged these two disabilities in the Compromise Settlement when they stated the "settlement is based upon approximate disability of 15% body as a whole *referable to* bilateral knees and the low back…." (emphasis added). "Referable," in this context, is defined as "capable of being considered as being related to or caused by something else." *Referable,* MERRIAM-WEBSTER.COM MEDICAL DICTIONARY, https://www.merriam-webster.com/medical/referable (last visited Aug. 18, 2022). Said another way, the settlement of 15% body as a whole is either "related to … something else", or "caused by something else." Here, the "something else" is the two disabilities, the bilateral knees and the low back, as acknowledged by the parties in the Settlement Agreement and found by the Commission. Thus, the Commission's finding was that the settlement based on a body as a whole rating was caused by two, differentiable disabilities; bilateral knees and low back. In doing so, it is evident the Commission *did* consider, in its entirety, the Compromise Settlement previously entered into by the Fund and Adams, and *did* hold the parties to its terms, inapposite to the dissent's contention that the Commission "dissect[s]" or re-evaluate[s]" the Compromise Settlement. The dissent also mischaracterizes our reading of the Compromise Settlement when it claims we are "now deciding that the injury was not to the body as a whole but instead constitutes two (inexplicably not three) separate injuries." Rather, we are emphasizing that Adams, and the dissent, get no further than the settlement term, "body as a whole", in their argument and ignore the underlying injuries to the bilateral knees and low back that resulted in the Compromise Settlement.

12

concluded, "Because ***non-qualifying*** preexisting disabilities contributed to employee's PTD, *Parker* compels us to conclude that the [Fund] has no liability in this case."

For the reasons stated above, we agree with the Commission's determination and are bound by its factual determinations that the 2001 Injury resulted in two clearly differentiable disabilities and neither disability resulted in PPD of at least 50-weeks. *Earnest*, 540 S.W.3d at 469. Thus, in light of the factual determinations made by the Commission, and pursuant to *Parker*, neither disability qualifies to be considered in the determination of PTD for Fund liability.

The basic premise of all of Adams' arguments is that the Commission should have treated the disability to the back and the disability to the bilateral knees as one disability for purposes of section 287.220.3, such that they would have met the 50-week PPD minimum. However, none of Adams' arguments are supported by compelling authority. This is due in large part to Adams' reliance on the prior statutory framework that called for a *liberal* construction of the provisions of Chapter 287 "'with a view to the public welfare'" that has since been replaced with the current framework requiring *strict* construction. *Kolar v. First Student, Inc.*, 470 S.W.3d 770, 777 (Mo. App. E.D. 2015) (quoting the pre-2005 amendment language of section 287.800). Moreover, Adams fails to acknowledge that we are bound by the Commission's factual determinations that the two disabilities were clearly differentiable and neither met the 50-week threshold. We address Point I first, but for convenience purposes, we address Points II and III together.

13

**Point I**

In Point I, Adams claims the Commission erred in failing to find the Fund stipulated that the disabilities which resulted from the 2001 Injury met the 50-week threshold of section 287.220.3 when it stipulated the disabilities represented 60-weeks of PPD to Adams' "body as a whole referable to bilateral knees and the low back." Adams' argument is not persuasive. The Commission found that Adams and the Fund "entered into [the] [C]ompromise [S]ettlement" related to the disabilities from the 2001 Injury, and that "[t]his settlement is based upon approximate disability of 15% of the body as a whole referable to bilateral knees and the low back (400-week level)." The Commission then found, "as a factual matter, that preexisting disability relating to employee's [2001] work injury did not result in PPD of at least fifty weeks to either employee's back or bilateral knees." That in 2001 the Fund entered into this Compromise Settlement does not also infer or result in an agreement that the disabilities meet the current statutory requirements of section 287.220.3[11] for purposes of determining PTD from either the bilateral knees or low back disability. Adams provides us no authority to the contrary.

The dissent argues that we are choosing "not to bind the Fund to the stipulation into which it entered in 2001 . . . ."[12] But we are not ignoring the 2001

---

[11] Obviously, the Compromise Settlement did not expressly state the Fund agreed that the body as a whole disability satisfied the 50-week threshold of section 287.220.3 as it had yet to be enacted.

[12] To support its argument that factual stipulations and final awards are binding in cases of subsequent injury and disabilities, the dissent quotes the following portion of section 287.190.6(1): "the percentage of disability shall be conclusively presumed to continue undiminished[.]" However, this quotation leaves out important language following the word "undiminished." The section states

the percentage of disability shall be conclusively presumed to continue undiminished *whenever a subsequent injury to the same member or same part of the body also results in permanent*

14

Compromise Settlement. Rather, we are bound by the Commission's factual determination that the Compromise Settlement does not presently satisfy the statutory requirements of section 287.220.3. We are neither questioning nor ignoring the factual determinations in either the Compromise Settlement or as found by the Commission. Instead, we determine the Commission's factual findings are supported by substantial evidence based on the whole record and conclude that the Compromise Settlement along with the other evidence in the record and viewed pursuant to section 287.220.3 does not require an award of PTD.

Moreover, the Compromise Settlement clearly states that "there are disputes between the parties" and "because of the dispute . . . the parties . . . enter into a compromise lump sum settlement . . . " based upon "approximate disability." In doing so, both parties acknowledged that this resolution of the claim is "referable to bilateral knees and the low back," the disabilities found by the Commission. Thus, the parties have made it clear that the 15% body as a whole is nothing more than a settlement which has aggregated the underlying disabilities. In doing so, the Compromise Settlement simply agrees to an *approximated* and *cumulative* disability rating for purposes of settlement without separately rating the individual disabilities themselves, a function necessary to determine whether either qualifies as a preexisting disability as defined by § 287.220.3(2). Point I is denied.

_____

*partial disability* for which compensation under this chapter may be due; provided, however, the presumption shall apply only to compensable injuries which may occur after August 29, 1959.

Section 287.190.6(1) (emphasis added). The emphasized language demonstrates that this section is not applicable to the present case, as Adams' Primary Injury involved completely separate body parts from those injured in the 2001 Injury and leaves the dissent's use of section 287.190.6(1) in this context unpersuasive.

15

**Points II and III**

In Point II, Adams claims the Commission erred in interpreting and applying section 287.190 to require that the disabilities which resulted from the 2001 Injury cannot be found to impact the body-as-a-whole for purposes of determining whether the disabilities meet the 50-week threshold of section 287.220.3. This is a mischaracterization of the Commission's decision. The Commission did not find that section 287.190[13] prohibits disabilities from being found to impact the body-as-a-whole for purposes of section 287.220.3. Rather, the Commission cited section 287.190 in noting the deficiencies in the Compromise Settlement in failing to separately estimate disability involving clearly differentiable body parts. In short, the reference to section 287.190 simply identifies the disabilities as clearly differentiable from one another and points out Adams' failure to separately identify the potentially-qualifying preexisting disabilities from one another. The Commission's decision is based entirely on *Parker's* requirement that each disability must qualify under section 287.220.3.

Further, both Adams' and the dissent's use of pre-2005 Missouri case law[14] recognizing the body-as-a-whole approach in construing section 287.190.3 is not

---

[13] Section 287.190.1 merely provides a schedule of losses for the "loss by severance, total loss of use, or proportionate loss of use of one or more of the members" enumerated on the schedule of losses. On this schedule of losses is included the proportionate loss of use of the leg "at or above the knee," such as Adams sustained. Notably, the lower back is not mentioned in the schedule of losses of subsection 1, but rather is a non-scheduled injury which falls under Section 287.190.3, commonly referred to as a "body as a whole" injury. The statutory separation of these disabilities into different subsections indicates they are to be considered separately rather than in combination.

[14] Adams cites to *Schwartz v. Shamrock Dairy Queen*, 23 S.W.3d 768, 773-74 (Mo. App. E.D. 2000); *Carenza v. Vulcan-Cincinnati, Inc.*, 368 S.W.2d 507, 514 (Mo. Ct. App. 1963); *Chapman v. Raftery*, 174 S.W.2d 352, 354-55 (Mo. Ct. App. 1943); and *Russell v. Kan. City Pub. Serv. Co.*, 276 S.W.2d 644, 648 (Mo. Ct. App. 1955). The dissent also cites *Carenza*, 368 S.W.2d at 514; *Chapman*,

16

persuasive. Their cited cases analyze the prior statutory framework that called for a *liberal* construction of the provisions of Chapter 287 "'with a view to the public welfare . . . .'" *Kolar*, 470 S.W.3d at 777 (quoting the pre-2005 amendment language of section 287.800).[15]  However, the statutory framework has since changed and we are now bound by strict construction, which "does not authorize . . . this court to add words to or subtract words from a statute or ignore the plain meaning of the words chosen by the legislature." *Naeter*, 576 S.W.3d at 237.  *Parker* reflects this current statutory framework, as it holds that *each* of the preexisting disabilities must qualify on its own under section 287.220.3(2)(a)a to be considered, and thereby rejects the notion that the 50-week threshold can be met by combining non-qualifying, preexisting disabilities.  622 S.W.3d at 182.  Importantly, *Parker* also demonstrates the legislature's retreat from its previous view to the public welfare by stating "the legislature amended section 287.220 *to limit the number of workers eligible for fund benefits* because the Fund was insolvent."  *Id.* at 181 (emphasis added) (citation omitted).  Such a shift from liberal construction with a view towards the public welfare, to strict construction, constitutes a sea change in the statutory framework of

---

174 S.W.2d at 354-55; and *Russell*, 276 S.W.2d at 648, as well as *Dauster v. Star Mfg. Co.*, 145 S.W.2d 499, 503 (Mo. Ct. App. 1940).

[15] Indeed, both Adams and the dissent cite *Chapman*, 174 S.W.2d at 354, in which the court stated "injustice to the injured employee would almost inevitably result" if, for purposes of fixing the compensable period, multiple injuries resulting from one accident were required to be separately rated in relation to the specific injuries outlined in the statutory schedule.  Such a view is also evident in *Dauster*, 145 S.W.2d at 502, a case the dissent cites and where the court asserted,

> The legislature intended to, and in our opinion did, cover any and every accidental injury.  The act was designed as a complete change in the relationship theretofore existing between employer and employee, and as a complete code to provide for their respective rights in case of any accidental injury to the employee arising out of and in the course of his employment.

(Citations omitted).  Notably, the court in *Dauster* also provided, "The language used in the act and all reasonable implications therefrom shall be liberally construed to effectuate its purpose, and all doubts resolved in favor of the employee."  *Id.* at 503 (citations omitted).

Chapter 287. Accordingly, the cases cited by Adams and the dissent do not reflect a proper construction of the current statutory framework, nor do they consider the legislature's clear intent to limit Fund liability.

The dissent also attempts to argue that "more modern cases" have utilized other methods to "deal[] with the compound effect of multiple disabilities arising from the same workplace accident . . . ." The dissent notes the use of a "multiplicity factor" as one such approach, citing *Kolar* and *Sturma v. Gen. Installation Co. of Mo.-Ill.*, 739 S.W.2d 586 (Mo. App. E.D. 1987) in support.[16] However, when looking at these two cases, one thing is absolutely clear: the Commission has ***discretion*** in how it addresses cumulative disabilities.[17] In *Kolar*, the Eastern District states, "The Commission has the ***discretion*** to include a multiplicity factor in assessing cumulative disabilities ***but is not required to do so***." 470 S.W.3d at 776 (emphasis added) (citing *Sharp v. New Mac Elec. Co-op.*, 92 S.W.3d 351, 354 (Mo. App. S.D. 2003) (overruled on other grounds)). Moreover, in construing language in *Chapman*, the Eastern District asserts in *Sturma*,

> *Chapman*, using the words "not necessarily" and "may", illustrates that the Commission has a choice as to how the award is calculated. The multiplicity factor, used when two or more disabilities interact to produce a greater overall injury, appears to fit within the discretion granted to the Commission when dealing with multiple injuries arising from one accident.

---

[16] The only other "modern" case the dissent cites is *Totten v. Treasurer of State*, 116 S.W.3d 624, 626 (Mo. App. E.D. 2003), which the dissent claims "utilizes the body-as-a-whole disability percentage for injury to 'the lower back, legs and body.'" (quoting *Totten*, 116 S.W.3d at 626). However, this case is unpersuasive for two reasons. First, it was decided before the 2005 and 2013 amendments. Second, the portion of *Totten* quoted by the dissent is referring to the *employee and employer* utilizing a body-as-a-whole percentage in a settlement, and not the utilization of such approach in the appellate court's analysis.

[17] It should be noted that of these two cases, only *Kolar* was decided after the 2005 and 2013 amendments.

739 S.W.2d at 588 (overruled on other grounds). In so stating, both *Kolar* and *Sturma* actually buttress the position of this principle opinion because the Commission utilized its discretion to combine injuries to both knees, yet consider separately the injury to the low back.[18]

Lastly, it must be emphasized that two disabilities were agreed to in the Compromise Settlement. The Compromise Settlement provides it "is based upon approximate disability of 15% of the body as a whole referable to bilateral knees ***and*** the low back (400-week level)." (emphasis added). Accordingly, it should be of no surprise that the Commission found two separate disabilities; they were explicitly agreed to in the Compromise Settlement. Point II is denied.

Point III can be similarly addressed. In Point III, Adams claims the Commission erred in interpreting and applying section 287.220.3 to require the disabilities which resulted from the 2001 Injury must each individually meet the 50-week threshold. Adams claims the disabilities must be combined for purposes of meeting the 50-week threshold to determine the preexisting disability for purposes of section 287.220.3.[19]

---

[18] The dissent chides us for "blindly accept[ing] the Commission's bare 'finding'" here of separate disabilities, but *Kolar* and *Sturma*'s language clearly state the Commission has ***discretion*** in how it addresses cumulative disabilities. Indeed, this is exactly what the Commission exercised when it found there were two distinguishable disabilities to the back and bilateral knees. Apparently recognizing this flaw in its position, the dissent walks back its argument, stating, "we are not prepared to say that the Commission must use body-as-a-whole disability to determine the overall disability in cases where multiple injuries are caused in a single workplace accident . . . ." Even if body-as-a-whole disability in a particular case was "the appropriate way to assess such disabilities" as the dissent argues, a reasonable reading of *Kolar* and *Sturma* permit the Commission discretion to either utilize or disregard same in any particular case.

[19] Notably, by arguing the "disabilities" should be combined, Adams is tacitly acknowledging he suffered multiple disabilities, which is exactly what the Commission found when it determined there were two distinguishable disabilities to the bilateral knees and low back.

19

In support of this argument, Adams cites that portion of *Parker* in which the Supreme Court held that the term "preexisting disability" in section 287.220.3(2)(a)b should be read as plural. 622 S.W.3d at 182 (citing section 1.030). In light of that holding, in his brief Adams claims that section 287.220.3(2)(a)a, when read with subsection (ii), reads: "medically documented preexisting disabilit[ies] equaling a minimum of fifty weeks of permanent partial disability compensation according to the medical standards that are used in determining such compensation which [are] a direct result of a compensable injury as defined in section 287.020."

Without any further citation to authority, Adams interprets this to mean that *all disabilities* which are the direct result of a single compensable injury are to be combined to determine if the 50-week threshold is met. Adams' interpretation fails for reasons similar to those explained in Point II. Not only is it at odds with the current statutory framework calling for strict construction, but it is also contrary to the holding in *Parker*, which requires that *each* of the preexisting disabilities must qualify on its own under section 287.220.3(2)(a)a to be considered. 622 S.W.3d at 182. The *Parker* court held that section 287.220.3(2)(a)b specifically excludes non-qualifying disabilities. *Id.* The Court concluded, "Therefore, an employee satisfies the second condition by showing the primary injury results in PTD when combined with *all preexisting disabilities **that qualify*** under one of the four eligibility criteria listed in the first condition." *Id.* (emphasis added). Accordingly, there may be a case where multiple disabilities from a single compensable injury *each* qualify, but that is not the case here. Rather, here, evidence was not presented that the injury to the

20

knees or the lower back, when either is considered on its own, met the 50-week threshold.   Point III is denied.

## Conclusion

The Commission's findings were supported by substantial and competent evidence.  Adams failed to establish a qualifying preexisting disability which, with his primary injury would entitle him to PTD benefits from the Fund pursuant to section 287.220.3.  Accordingly, the Commission's decision is affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

Fischer, Sp.J. concurs
Witt, J. dissents in separate opinion



# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

WALTER ADAMS,                    )
                                 )
            Appellant,           )
                                 )
v.                               )        WD84818
                                 )
TREASURER OF THE STATE           )        Filed: October 25, 2022
OF MISSOURI – CUSTODIAN          )
OF THE SECOND INJURY             )
FUND,                            )
                                 )
            Respondent.          )

## DISSENTING OPINION

I respectfully dissent. I agree with the majority that, per *Treasurer v. Parker*, 622 S.W.3d 178 (Mo. banc 2021), and *Klecka v. Treasurer*, 644 S.W.3d 562 (Mo. banc 2022), *each* partial disability arising prior to the primary injury that is considered in determining that a claimant is permanently totally disabled must be a qualifying disability under section 287.220.3 in order to trigger Fund liability. I disagree, however, that Adams's 2001 injury does not constitute a single qualifying disability such that it should not be considered in determining his permanent total disability and Fund liability.

The majority repeatedly recites that we are bound by the Commission's factual determinations and acts as though that ends the analysis. But *Parker* and *Klecka* both turn on the *legal* issue of what the Commission should properly consider in making its determination of permanent total disability, and I conclude, in this case, that the Commission erred, legally, in several respects.

First, the Fund had previously stipulated, as part of a settlement that its attorney signed on its behalf, that Adams's 2001 work accident resulted in "approximate disability of 15% of the body as a whole referable to bilateral knees and the low back (400-week level)." Neither the Commission nor the majority deems it appropriate to bind the Fund to this *factual* stipulation that it entered into. Rather, the Commission and the majority dissect the agreement between Adams and the Fund, over twenty years later, now deciding that the injury was not to the body as a whole, as stated, but instead constitutes two (inexplicably not three) separate disabilities. The majority finds support in the expert opinions rendered prior to the settlement of the 2001 injury. But those opinions are now irrelevant and, in any event, could easily have been found not to have been credible by the Commission *at the time* had the case not been settled, and the Commission might well also have found this to be a body-as-a-whole injury *at that time.* It is not up to the present Commission to re-evaluate the 2001 injury and ignore the stipulation and settlement of the parties. The Commission approved the settlement of the 2001 injury, and the parties to that agreement are bound by the terms of that settlement.

2

While there are many cases that rightly refuse to bind the Fund to factual stipulations made in settlement agreements between an injured employee and his or her employer, the reason that the Fund is not generally bound is that the Fund is not a party to those settlements, and it "cannot be held liable upon a settlement contract unless it has *expressly consented to and joined in* such a contract." *Totten v. Treasurer*, 116 S.W.3d 624, 628 (Mo. App. E.D. 2003) (quoting *Bailey v. Indus. Comm'n*, 484 N.E.2d 376, 380 (Ill. 1985)). In these cases, the court has pointed out "that no attorney on behalf of the Fund had signed the settlement, and the claimant did not assert that the Fund was otherwise a party to the settlement." *Seifner v. Treasurer*, 362 S.W.3d 59, 64 (Mo. App. W.D. 2012). These cases strongly imply that, had the Fund been a party to the settlement agreement, and had its attorney signed its agreement to the settlement, it would be bound to the factual stipulations recited therein.

The factual stipulation of the 2001 settlement is signed by the attorney for the Fund and is direct and plainly worded.[20] Yet the majority chooses not to bind the Fund to the stipulation into which it entered in 2001 because, at that time, it could not have realized that the stipulation would "result in an agreement that the

---

[20] The majority focuses on the term of the settlement indicating it is based upon "approximate disability." This is truly a red herring as every settlement in every worker's compensation case is a **compromise** between the parties, primarily based upon the disability rating provided by the employee's and the employer's physician's expert opinions as to the rating of disability for the employee's injury. In those cases, we bind the employee and the employer to the rating of disability included in the settlement agreement and approved by the ALJ. In cases where the Fund is a party to the settlement agreement, as in this case, they are also bound by the terms of that agreement. The "approximate disability" contained in the settlement agreement represents the agreement of the parties as to Adams disability arising from that 2001 accident and injury. Certainly, if the 2001 injury had been settled for an "approximate disability" equal to 49 weeks, the Fund would correctly argue that Adams could not now try to establish that the 2001 injury met the 50-week threshold because he would be bound by the settlement he entered into at the time. In this case the Fund doesn't like the body as a whole settlement it entered into in 2001 and wants a do-over. However, final settlements are binding on every party to the settlement, including the Fund.

3

disabilities meet the current statutory requirements of section 287.220.3 for purposes of determining PTD. . . [or] that the body as a whole disability satisfied the 50-week threshold of section 287.220.3 as it had yet to be enacted." But factual stipulations and final awards in worker's compensation cases are *intended* to be relied upon, and the award is binding in cases of subsequent injury and disabilities. This was clearly set forth by the legislature in section 287.190.6(1), which states that after a final award "the percentage of disability shall be conclusively presumed to continue undiminished[.]" While the Fund could not anticipate or appreciate every possible future legal implication of its 2001 factual stipulation and the final award resulting therefrom, this does not render the stipulation invalid, and the majority cites to no authority for the proposition that it should be invalid or that the Fund should not be bound.

Moreover, the stipulation to the body-as-a-whole partial disability in the 2001 settlement is in keeping with general worker's compensation law. Missouri cases have a long history of combining several injuries into a disability of the "body as a whole," especially when the injuries are sustained in the same workplace accident. In *Dauster v. Star Manufacturing. Co.*, 145 S.W.2d 499, 503 (Mo. App. 1940), the court recognized that when multiple body parts are injured in the same accident, the schedules that rate disability for an individual body part may not accurately reflect the claimant's disability. *Dauster* notes that:

> an injury is not specific within the meaning of a schedule unless such injury relates solely to the injured member, and, if because of an injury to a specific member the whole body suffers, thereby incapacitating the workman, the injury is not specific, and if an employee suffers a specific

4

injury and at the same time sustains other injuries, or if such specific injury has involved other portions of the body to such an extent as to cause an injury additional to the specific injury, claimant is not confined to the compensation provided for the injury to the specific member.

*Id.* (internal quotation omitted). Also, as *Parker* points out, "section 1.030 instructs that the singular form should be interpreted to include the plural form." *Parker*, 622 S.W.3d at 182. If "disability" includes "disabilities," why shouldn't a qualifying disability, which section 287.220.3(2)(a)(ii) defines as the "direct result of a compensable injury" include disabilities directly resulting from multiple contemporaneous compensable "injuries" arising from a single workplace accident?

*Chapman v. Raftery*, 174 S.W.2d 352, 354 (Mo. App. 1943), reiterated the holding in *Dauster* in a case where, similarly to the present case, the claimant employee had injured both legs and his back in a single workplace injury. The court stressed that, with a practice of limiting an injured employee to the scheduled injuries:

[I]njustice to the injured employee would almost inevitably result, and especially so in a case such as this where the multiple injuries have a close relation to one another so that the one affects and aggravates the others. For instance, in the case of leg injuries, if the injury is to but one leg, the resulting disability is greatly lessened by reason of the fact that the sound leg can be put to added service to compensate for the one that must be favored; but if both legs are injured at one and the same time, there is no such advantage to be taken, and the resulting disability is obviously not to be measured by combining the ratings for separate injury to each leg. And if to this is added a further disability from pain in the back on movement, the whole picture must be viewed in its entirety, and the proper compensable period is to be fixed, not by taking the sum total of weeks of compensation allowed for each separate and specific injury, but instead by determining (in so far as may be) the percentage of disability in the normal functions of the man [i.e., body as

5

a whole], and then awarding compensation for the corresponding portion of 400 weeks, which is the maximum permitted by the act for permanent partial                                                    disability.

*Id.* at 354-55. Simply stated, sometimes the whole is greater than the sum of its parts.

*Russell v. Kansas City Public Service Co.*, 276 S.W.2d 644 (Mo. App. 1955), explains using the "catch-all" provisions of section 287.190 when there are multiple injuries, stating, "the statute did not contemplate two periods of compensation in such cases, but only one period not exceeding 400 weeks, to be fixed in such proportion to the relation which the other injury bears to the injuries specified in the schedule; not in proportion to the arbitrary periods of payment provided in the schedule for a single injury, but in proportion to the relation which one injury bears to another injury when both injuries are the result of the same accident." *Id.* at 648 (internal quotation omitted). *Carenza v. Vulcan-Cincinnati, Inc.*, 368 S.W.2d 507, 514 (Mo. App. 1963) held that the "multiplicity of injury" in that case "*required* the Commission to determine the extent of the injury based on the body as a whole." (Emphasis added).

The majority ignores all of these cases, stating, repeatedly, that the legislature amended chapter 287 in 2005, prescribing a strict construction instead of a liberal construction.[21] But the issue in this case is simply not one of liberal or strict

---

[21] The majority notes that "at the time section 287.220 was amended, the fund was insolvent" citing, *Cosby v. Treasurer of State*, 579 S.W.3d 202, 209-10 (Mo. banc 2019). What *Cosby* and prior cases have failed to note is that the reason the Fund was insolvent at that time was due to the intentional underfunding. Historically the Fund has been funded by various methods which have been amended from time to time by the legislature. In 2005 the legislature capped the surcharge that was used to provide its funding at three percent. Jason R. McClitis, *Missouri's Second Injury Fund - Should It Stay or Should It Go?: An Examination of the Question Facing the Missouri State Legislature*, 74 Mo. L. Rev. 399, 409 (2009). At the time that legislation was passed the fiscal note indicated that the capped amount would be ultimately insufficient to maintain the solvency of the Fund. The Fund became drastically but intentionally underfunded creating the clearly foreseeable and avoidable resulting "crisis".

construction of the statutes. It is an issue of the impact of an injury on an employee and the amount of disability caused by that injury. In 2001, Adams, in a single accident, injured both of his knees and his lower back, and the parties' stipulation reflects an agreement that the disability caused by the combined injury was properly determined to be a disability to the body as a whole because often the resulting disability is greater than the sum of its parts.

Some more modern cases have dealt with the compound effect of multiple disabilities arising from the same workplace accident in other ways, such as using a "multiplicity factor." *Sturma v. Gen. Installation Co. of Mo.-Ill.*, 739 S.W.2d 586 (Mo. App. E.D. 1987) (overruled on other grounds); *Kolar v. First Student, Inc.*, 470 S.W.3d 770 (Mo. App. E.D. 2015). But *Totten*, a 2003 case, utilizes the body-as-a-whole disability percentage for injury to "the lower back, legs and body." *Totten*, 116 S.W.3d at 626. While I am not prepared to say that the Commission must use body-as-a-whole disability to determine the overall disability in cases where multiple injuries are caused in a single workplace accident, it will often be the appropriate way to assess such disabilities particularly when injury to different body parts combines to increase the overall disability, and it should at least be respected in cases where such assessment has been previously stipulated by the Fund.

Neither the majority opinion nor the Commission's decision discusses *any* of the above cases other than to summarily dismiss them as being before the statutory amendments or cites to a single post-amendment case where disability is caused by multiple injuries arising from the same workplace accident affecting more than just

7

an individual body part. Instead the majority opinion just blindly accepts the Commission's bare "finding" that the body-as-a-whole disability to Adams's back must be considered separately from the incomprehensibly inconsistent finding of a single disability from his *bilateral* knees. Using the Commission's own rationale, the knees must be considered as separately scheduled disabilities, yet the Commission's decision, and the majority opinion, talk about the "two" disabilities (not three) resulting from Adams's 2001 accident. Finally, neither *Parker* nor *Klecka* mandates the majority's result. *Klecka* merely held that the claimant's total permanent disability, for purposes of Fund liability, could not consider:

a) 1981 traumatic brain injury sustained in a motor vehicle accident;

b) 1982 left knee surgery to correct frequent dislocations;

c) 2005 right thumb work-related injury that settled for 15 percent, or nine weeks, of PPD;

d) 2006 hernia that settled for 7.5 percent, or 30 weeks, of PPD.

*Klecka*, 644 S.W.3d at 564. There was no relevant disability where multiple injuries arose from a single workplace accident, and more specifically there was no relevant disability that was exacerbated by the combination of multiple injuries arising from a single workplace accident. And *Parker* merely stated that all disabilities that are considered in determining whether a claimant is permanently totally disabled for the purposes of the second injury fund must be qualifying disabilities. *Parker*, 622 S.W.3d at 182. It did *not* hold or render any opinion on whether a qualifying body-as-a-whole disability could be comprised of injuries to more than one body part, or whether it could include body parts that appear in the statutory schedules.

8

Therefore, neither *Parker* nor *Klecka* warrants disregard of our prior case law that addresses situations such as Adams's 2001 injuries.

For all of these reasons, I would find that the Commission should have, per the evidence, including the 2001 stipulation to which the Fund was a party, determined that the disability arising from the 2001 accident was a qualifying disability under section 287.220, and thus should have been considered in determining Fund liability for Adams's permanent total disability.

_____
Gary D. Witt, Judge

9